IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| CURT DANIELS aka CURT DANIELS dba INDIAN CREEK CORPORATION,<br><br>          Plaintiff,<br><br>vs.<br><br>STATE OF IOWA, JEFFERY VONT, LYLE ASELL, PAUL JOHNSON, LARRY WILSON, and JULIE NELSON,<br><br>          Defendants. | **No. 4:04-cv-40420**<br><br>**O R D E R** |

This matter comes before the Court on Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12.  Plaintiff Curt Daniels represents himself in this matter; Defendants State of Iowa, Jeffery Vont, Lyle Asell, Paul Johnson, Larry Wilson, and Julie Nelson are represented by David Steward and Timothy Benson.  The parties have not requested a hearing, and the Court finds no hearing is necessary.  The matter is fully submitted and ready for disposition.

## I.  FACTS

Plaintiff Daniels ("Daniels") was owner and operator of Indian Creek Corporation hog confinement feeding operation in Jasper County, Iowa ("Indian Creek Operation").  At various times relevant to this case, Defendants Vont, Asell, Johnson,

and Wilson were Directors of the Iowa Department of Natural Resources ("DNR");

Defendant Nelson was an "Environmental Specialist" for the Iowa DNR.

In September 1998, the Iowa DNR sent a letter to Indian Creek and Daniels,

citing persistent manure management problems at the site and directing corrective

action.  In October 1998, Nelson began an inspection of the site and buildings and

observed continuing manure management violations.  On April 17, 2000, the Iowa

Environmental Protection Commission ("EPC") voted to refer Daniels and the Indian

Creek Operation to the Iowa Attorney General's Office for a variety of waste handling

violations.  On September 27, 2000, the State of Iowa filed suit in the Iowa District

Court for Jasper County, alleging Daniels committed the following infractions in

violation of Iowa Code § 455B.201 and 567 Iowa Administrative Code § 65.2(3):

(1) failure to retain hog manure; (2) failure to maintain adequate freeboard in storage

basins; (3) improper utilization of spray irrigation of hog waste; (4) illegal use of an

uncertified manure applicator; (5) failure to properly close a well; (6) failure to remove

manure from an abandoned basin; (7) failure to submit an acceptable manure manage-

ment plan; and (8) failure to submit an evaluation report and application for a con-

struction permit.

Daniels denied all material allegations and raised the defense that the facility

lessee, Prairie Polk Farms, Inc., was responsible for management of the manure.

Daniels did not assert any counterclaims or affirmative defenses, nor did he assert that his statutory or constitutional rights had been violated.  The case culminated in a two-day trial which began October 24, 2001.  On November 19, 2001, the court entered its findings of fact and conclusions of law, determining the State met its burden of proving Daniels committed the violations alleged against him.  The court assessed the maximum civil penalty for the violations which totaled $95,000.  The court also ordered Daniels to remove the remaining manure and properly close the structure.

On December 3, 2001, Daniels filed a motion to set aside judgment pursuant to Iowa R. Civ. P. 179(b), asking the court to review the reasonableness of the $95,000 judgment.  The state court denied the motion on December 14, 2001.  Daniels filed a notice of appeal with the Iowa Supreme Court on January 14, 2002.  In response, the Iowa Supreme Court entered an order declining jurisdiction and dismissing the appeal as untimely because it had not been filed within thirty days of the district court's ruling.[1]  Daniels filed a petition for writ of certiorari with the Iowa Supreme Court

---

[1] The Jasper County District Court's ruling was issued on November 19, 2001. Fourteen days later, on December 3, 2001, Daniels filed a motion to set aside the judgment.  On December 14, 2001, the motion was denied, and on January 14, 2002, Daniels filed a notice of appeal to the Iowa Supreme Court.  In a written opinion, the court denied the appeal as untimely, explaining that Daniels' motion to set aside judgment was not filed until December 3, 2001, and was therefore untimely under Iowa Rule 1.904(2) since notices of appeal must be filed within ten days of judgment.  See Nuzum v. State, 300 N.W. 2d 131, 134 (Iowa 1981) ("A motion to reconsider a

raising substantial constitutional violations alleging the DNR improperly applied the statutes and administrative rules.  Daniels' petition was denied on January 8, 2003.

On April 7, 2003, Daniels filed a petition for writ of certiorari to the United States Supreme Court raising the following questions:  (1) whether Fifth Amendment property rights can be deprived by state environmental regulators in the absence of statutory authority when no pollution is documented or alleged; (2) whether due process and equal protection under the Fourteenth Amendment can be deprived by state environmental regulators when no pollution is documented or alleged; and (3) whether the state can impose excessive fines in violation of the Eighth Amendment.  The Supreme Court denied Daniels' petition on October 6, 2003.  See Indian Creek Corp. v. Iowa ex rel. Iowa Dep't of Natural Res., 540 U.S. 822 (2003).

On August 4, 2004, Daniels filed the present action pursuant to 42 U.S.C. § 1983 ("§ 1983"), alleging Defendants violated several constitutional protections, including his rights under the Fourteenth, Fifth, Sixth, and Eighth Amendments. Daniels asserts that while acting under the color of state law, (1) Defendants exceeded

---

judgment under rule 179(b) [currently Iowa Rule 1.904] must be filed within ten days after the decision is filed.  . . .  An untimely rule 179(b) motion does not toll the period for filing an appeal.").  Accordingly, time for filing a notice of appeal ran on December 19, 2001.  The untimely notice of appeal deprived the court of jurisdiction, and the appeal had to be dismissed.  Ahls v. Sherwood/Division of Harsco Corp., 473 N.W. 2d 619, 620 (Iowa 1999).

the scope of their authority, depriving him of rights, privileges, and immunities secured

by the Constitution, by prosecuting him for alleged regulation violations and com-

mitting a regulatory taking by suspending the permits necessary to run his operation;

(2) Defendants knew or should have known they were acting under an unconstitu-

tional statute and depriving Plaintiff of his right to due process; (3) Defendants caused

Plaintiff to expend considerable sums and made illegal compliance demands upon

Plaintiff; (4) Defendants brought false charges against Plaintiff; (5) Defendants singled

Plaintiff out for violations and did not prosecute others similarly situated; and

(6) Defendants imposed excessive fines in violation of the Eighth Amendment.

Daniels seeks the following relief in this action: (i) find Iowa Code § 455B.109

unconstitutional; (ii) void the Iowa state court judgment against him; (iii) enjoin the

State of Iowa from further adverse actions against him under the statute; (iv) find

Defendants' actions constituted a taking under the Fifth Amendment; (v) return the

monies and property that have been taken and payment of monetary damages for

property loss, loss of income, and damage to personal and professional reputation;

and (vi) award $1.2 million in damages for Defendants' malicious activity.

    In response to Daniels' claims, Defendants filed the present Motion to Dismiss

pursuant to Federal Rule of Procedure 12(b), asserting dismissal is appropriate for the

following reasons: (1) the Court lacks subject matter jurisdiction under the <u>Rooker-</u>

Feldman doctrine; (2) Daniels' claims are barred by the doctrine of claim preclusion;

(3) Daniels' claims are barred by the doctrine of issue preclusion; (4) all allegations

against the state and individual Defendants are barred by sovereign immunity; and

(5) all individually named Defendants have absolute and qualified immunity. Daniels

resists the motion, claiming that the Rooker-Feldman doctrine is inapplicable in this

instance and that unforseen circumstances precluded him from raising the constitu-

tional claims he presently asserts.

## II.  DISCUSSION

A.   *Rooker-Feldman* **Doctrine**

Defendants argue that Daniels' claims should be dismissed because the Court

does not have subject matter jurisdiction under the Rooker-Feldman doctrine. Defen-

dants maintain that Daniels' current claims are nothing more than an attempt to

overturn the state court judgment and are just the type of litigation that the Rooker-

Feldman doctrine necessarily prevents. Daniels resists the motion and asserts that

Rooker-Feldman is inapplicable in this instance because he was denied reasonable

opportunity to raise his claims in state court.[2] Daniels cites Simes v. Huckabee, 354

F.3d 823, 827 (8th Cir. 2004), and argues that because he has not been given a

---

[2] Daniels also argues that the penalties assessed by the state court were so
severe that they constitute criminal penalties and that he has not had an opportunity to
litigate that claim.

reasonable opportunity to raise his claims in state court, those claims are not barred by the Rooker-Feldman doctrine.

The Rooker-Feldman doctrine has its origin in two Supreme Court decisions dealing with the appellate jurisdiction of federal courts:  District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 476 (1983) and Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16 (1923) ("Rooker II").  "The Rooker-Feldman doctrine stands for the general principal that, with the exception of habeas corpus petitions, lower federal courts lack subject matter jurisdiction to review state court judicial decisions."  Prince v. Arkansas Bd. of Exam'rs, 380 F.3d 337, 340 (8th Cir. 2004) (citing Feldman, 460 U.S. at 476; Rooker, 263 U.S. at 415-16).  Jurisdiction in federal district court is strictly original, and an attempt to entertain proceedings reviewing or modifying the judgment of a state court would be an exercise of appellate jurisdiction.  Rooker v. Fidelity Trust Co., 263 U.S. 413 at 416.  Jurisdiction to review state court judicial decisions is vested solely in the United States Supreme Court.  Prince, 380 F.3d at 340 (citing Lemonds v. St. Louis County, 222 F.3d 488, 492 (8th Cir. 2000)).  Litigants may not pursue federal claims which contain allegations that are inextricably intertwined with the state court decision.  Id.

Rooker came to the United States Supreme Court in two rounds.  First, plaintiffs filed a petition for writ of error, requesting review of an Indiana Supreme Court decision.  Rooker v Fidelity Trust Co., 261 U. S. 114 (1923) ("Rooker I").

Defendant challenged the Court's jurisdiction, arguing the petition had not raised a federal question.  Rooker I, 261 U. S. at 116-17.  The Court agreed, reasoning that before the Indiana Supreme Court decision was rendered, the plaintiffs had not made any effort to raise such a challenge.  Id. at 117.

> "[The record] does not show that the question was raised in any way prior to the judgment of affirmance in the [Indiana] Supreme Court. . . . All that appears is that after the judgment of affirmance the plaintiffs sought to raise the question by a petition for rehearing, which was denied without opinion.  But that effort came too late. . . . *Federal questions, like others, should be presented in an orderly way before judgment. . . .* It is at least doubtful that the question is of any substance, but *its tardy presentation renders further notice of it unnecessary*.

Id. (citations omitted) (emphasis added).

Plaintiffs then filed an action in federal district court alleging the state court judgment was rendered in contravention of the United States Constitution and asked the federal district court to find the judgment null and void.  Rooker II, 263 U.S. at 414-15.  The district court dismissed for lack of subject matter jurisdiction; plaintiffs appealed directly to the United States Supreme Court.  Id. at 415.  The Rooker II Court affirmed the state court judgment reasoning,

> It affirmatively appears from the bill that the judgment was rendered in a cause wherein the [state] circuit court had jurisdiction of both the subject-matter and the parties, that a full hearing was had therein, that the judgment was responsive to the issues, and that it was affirmed by the Supreme Court of the state on an appeal by the plaintiffs.  If the constitutional questions stated in the bill actually arose in the cause, it was the province and duty of the state courts to decide them; and their

> decision, whether right or wrong, was an exercise of jurisdiction.  If the
> decision was wrong, that did not make the judgment void, but merely
> left it open to reversal or modification in an appropriate and timely
> appellate proceeding.  Unless and until so reversed or modified, it would
> be an effective and conclusive adjudication.

Id. (citation omitted) (citing Rooker v. Fidelity Trust Co., 131 N.E. 769 (Ind. 1921)).

The Court further noted that appellate authority to reverse or modify a state court

judgment exists only with the United States Supreme Court; federal district courts lack

appellate authority as their jurisdiction is strictly original.  Id. at 416.

Sixty years later in District of Columbia Court of Appeals v. Feldman, the

Court again considered the issue of whether federal district courts have jurisdiction to

review state court decisions.  Feldman, 460 U.S. at 463.  In Feldman, the plaintiffs

had applied to take the District of Columbia ("the District") bar examination, but their

applications were denied because the District's bar admission rule, D.C. Code § 11-

2501(a) [hereinafter "Rule 46"] only allowed applicants who were graduates of

approved law schools.  Id.  The plaintiffs petitioned the District of Columbia Court of

Appeals ("D.C. Court of Appeals"), requesting a waiver of Rule 46; the Court denied

those petitions.[3]  Feldman, 460 U.S. at 468, 471.  The plaintiffs each filed an action in

federal district court challenging the decisions and asserting that Rule 46 violated

---

[3] Feldman involved two plaintiffs and two separate cases with identical issues.
Feldman, 460 U.S. at 474 n.10.  The cases were not consolidated, but were dealt with
together by the D.C. Circuit since they raised the same legal issues and were argued
on the same day.  Id.

federal anti-trust laws and the Fifth Amendment of the U.S. Constitution.  Id. at 467,

471.  The federal district court dismissed all claims by both plaintiffs, reasoning the

D.C. Court of Appeals was performing a judicial function in denying the waiver, and

therefore the decision was reviewable only by the United States Supreme Court pur-

suant to 28 U.S.C. § 1257.[4]  Id. at 470, 473.

The plaintiffs appealed to the United States Court of Appeals for the District of

Columbia ("D.C. Circuit") which affirmed the district court's dismissal of the

anti-trust claims but reversed the dismissal of the constitutional claims.  Id. at 473.

The D.C. Circuit reasoned that the decisions to deny the applicants' waivers "'were

not judicial in the federal sense, and thus did not foreclose litigation of the

constitutional contentions in the District Court.'"  Id. at 474.

---

[4] Title 28 U.S.C. § 1257 states in pertinent part,
(a) Final judgments or decrees rendered by the highest court of a State in
which a decision could be had, may be reviewed by the Supreme Court
by writ of certiorari where the validity of a treaty or statute of the United
States is drawn in question or where the validity of a statute of any State
is drawn in question on the ground of its being repugnant to the Consti-
tution, treaties, or laws of the United States, or where any title, right,
privilege, or immunity is specially set up or claimed under the Consti-
tution or the treaties or statutes of, or any commission held or authority
exercised under, the United States.
(b) For the purposes of this section, the term 'highest court of a State'
includes the District of Columbia Court of Appeals.
28 U.S.C. § 1257 (a),(b).

The Supreme Court granted certiorari to resolve the issue.  <u>Id.</u> at 476.  The Court reiterated that federal district courts lack subject matter jurisdiction to review the decisions of the District's highest court and that appellate review of such a judgment was only available from the United States Supreme Court.  <u>Id.</u>  The Court went on to distinguish a judicial proceeding from an administrative or ministerial proceeding, concluding "the proceedings before the District of Columbia Court of Appeals involved a 'judicial inquiry' in which the court was called upon to investigate, declare, and enforce 'liabilities as they [stood] on present or past facts and under laws supposed already to exist.'"  <u>Id.</u> (quoting <u>Prentis v. Atl. Coast Line</u>, 211 U.S. 210, 226 (1908)).

The Court further reasoned that subject matter jurisdiction was not lacking in the federal district court to the extent petitioners' complaints mounted *general* challenges to the constitutionality of Rule 46.  <u>Id.</u> at 482-83.  However, the Court noted that failure to raise a constitutional challenge in state court which was "inextricably intertwined" to the state court proceeding *would* forfeit a plaintiff's right to raise that claim in federal court.  <u>Id.</u> at 483 n.16.  The Court explained that lower federal courts "do not have jurisdiction, however, over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional.  Review of those decisions may be had only in this [United States Supreme] Court."  <u>Id.</u>  In applying those

principles to the case before it, the Court found that plaintiffs' attacks on the constitutionality of Rule 46, *as it applied in their particular cases*, were inextricably intertwined with the D.C. Court of Appeals' decision, and thus the lower federal courts lacked jurisdiction over those claims.  Id. at 486-87 & n.3.  Nonetheless, the Court found that plaintiffs' claims which generally attacked the constitutionality of Rule 46 did not require review of the judicial decision in any particular case, and therefore jurisdiction was not lacking.  Id. at 487.

During the pendency of this case, the Supreme Court handed down Exxon Mobil Corporation v. Saudi Basic Industries Corp., 544 U.S.---; 125 S. Ct. 1517 (2005).  Exxon Mobil provides further guidance regarding the Rooker-Feldman jurisdictional bar to lower federal courts in actions where the requested relief requires the court to *review* a state court decision, a review over which only the Supreme Court has authority.  Id., 544 U.S. at ---, 125 S. Ct. at 1527-28 (citing 28 U.S.C. § 1257).  Exxon Mobil stresses that while § 1257 does not necessarily prevent a district court from exercising jurisdiction over cases simply because the matter has previously been litigated in state court, the *disposition* of the case may ultimately be determined by the principles of preclusion.  Id. ("Preclusion, of course, is not a jurisdictional matter.  In parallel litigation, a federal court may be bound to recognize the claim- and issue-preclusive effects of a state-court judgment, but federal jurisdiction over an action does not terminate automatically on the entry of judgment in the state court.").

Accordingly, as case precedent demonstrates, for the <u>Rooker-Feldman</u> doctrine to be implicated, claims must be inextricably intertwined with the state court judgement.  <u>Prince</u>, 380 F.3d at 341 (citing <u>Lemonds</u>, 222 F.3d at 493).

> Federal Claims are inextricably intertwined if they undermine the state court judgment succeeding only to the extent that the state court wrongly decided the issue before it.  A claim does not undermine the state court judgment if it merely challenges the constitutionality of a legislative act by a rule-making body, but if the litigant's interest in having the rule or regulation set aside is inseparable from his interest in upsetting a particular state court judgment based on that rule, the challenge is no longer independent.

<u>Id.</u> (citing <u>Lemonds</u>, 222 F.3d at 493 (quoting <u>Pennzoil Co. v. Texaco, Inc.</u>, 481 U.S. 1, 25 (1987)).

Claims are inextricably intertwined with a state court's judgment if the relief a claimant seeks for the federal claims would directly nullify the judgment of the state court.  <u>Id.</u> (citing <u>Lemonds</u>, 222 F.3d at 393).  The type of relief sought by the litigant many times indicates whether or not the claim will be considered "inseparable" from upsetting a state court judgment.  <u>Van Harken v. Chicago</u>, 103 F.3d 1346, 1349 (7th Cir. 1997).  Challenges will not remain separable if the party seeks monetary damages for the application of a rule already challenged in state court.  <u>Id.</u>

Furthermore, if a party has litigated in state court, he cannot bypass <u>Rooker-Feldman</u> when he seeks to undermine that state court judicial decision in federal district court by casting it as an action pursuant to 42 U.S.C. § 1983.  <u>Prince</u>, 380

F.3d at 340 (citing <u>Bechtold v. City of Rosemont</u>, 104 F.3d 1062, 1065 (8th Cir. 1997)).  In other words, a litigant who has raised and lost a claim in state court may not subsequently challenge the state court decision in the context of a § 1983 claim. <u>Id.</u>; <u>see also</u> <u>Exxon-Mobil</u>, 544 U.S. at ---, 125 S. Ct. at 1527-28 ("[C]ases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.").

In the present case, Defendants argue Daniels' claims are barred by the <u>Rooker-Feldman</u> doctrine.  Daniels resists, asserting <u>Rooker-Feldman</u> does not apply because he is not seeking a review of the state court judgment.  He argues that since the state court judgment was founded upon a statute that is constitutionally repugnant, both facially and as applied, this Court must find the judgment was illegitimate and is void ab initio as a matter of law.  Daniels also asks for $1.2 million in monetary damages for loss of property, loss of income, and damage to his personal and professional reputation, and for return of the assessed monetary penalties.

Daniels refutes the application of <u>Rooker-Feldman</u> in the instant case and relies entirely on <u>Simes v. Huckabee</u>, 354 F.3d 823, 827 (8th Cir. 2004), asserting that federal claims not raised in state court are not barred in federal court.  Given the depth of Plaintiff's reliance on <u>Simes</u>, the Court will discuss that case in some detail.

14

The Simes case originated in an Arkansas state circuit court as a contempt pro-
ceeding against five members of a county quorum court ("QC")[5] who refused to
submit the question of a sales tax increase to the voters as mandated by state statute.
Id. at 825.  Suit was filed in the county circuit court against the QC members in their
official capacity, seeking a writ of mandamus to force the majority to follow the
statutory mandate requiring them to vote to call the election.  Id.  The circuit court
held a hearing and ordered the QC members to meet and vote to enact the proposed
ordinance.  Id.  The members never voted.  Id.  The circuit court found the
recalcitrant members in contempt and jailed them for four days.  Id.  While jailed,
they filed a writ of prohibition (or habeas corpus) with the Arkansas Supreme Court
and appealed the contempt ruling.  Id.  In both the writ and the appeal, the members
alleged violation of various state and federal statutes.  Id. at 826.

The Arkansas Supreme Court granted the writ and remanded the case to the
state circuit court with instructions to address the *state law* issues.  Id.  *Before* the
circuit court rendered its opinion, the members filed a claim in federal district court
alleging several federal statutory and constitutional violations against various Arkansas
officials.  Id.  The district court granted the defendants' motions to dismiss, finding it
lacked jurisdiction because the claims were barred by the Rooker-Feldman doctrine.

---

[5] A quorum court is a county's legislative body which passes ordinances for the
county just like the legislature passes acts and bills for the state.

Id.  On appeal, the Eighth Circuit reversed the district court, reasoning that although the appellants raised the issues to the Arkansas Supreme Court, the court declined to address any of the appellants' federal claims, and therefore the Rooker-Feldman doctrine did not apply.  Id. at 827-28.  Daniels argues that similarly in this case, he has not been given a reasonable opportunity to raise federal claims because the Iowa Supreme Court denied his petition for certiorari.

The facts in the Simes case are distinguishable from the present case.  The plaintiffs in Simes actually raised multiple federal claims in Arkansas state court, but the state court refused to consider those federal claims and ruled only on the state claims.  Id.  Here, unlike in Simes, the state court *did not refuse* to consider *timely raised* federal claims; rather, the Iowa Supreme Court denied Daniels' petition for certiorari, which included federal claims, because the petition was not timely filed.  Id. Furthermore, the plaintiffs in Simes filed their federal lawsuit *while* the state lawsuit was still pending.  Id. at 825.  Once adjudication of those state court claims or issues were complete, preclusion doctrines would have affected the same claims and issues brought in the federal forum, but those claims not previously raised would have been preserved.  Exxon Mobil, 544 U.S. at ---, 125 S. Ct. at 1527 ("Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law.").

Unlike the plaintiffs in <u>Simes</u>, Daniels failed to raise or preserve his federal claims during the state court proceeding.  His failure to timely appeal did not somehow preserve claims he failed to raise; in fact, the Supreme Court rejected precisely the same argument in <u>Feldman</u>.

> If the constitutional claims presented to a United States District Court are inextricably intertwined with the state court's denial in a judicial pro-ceeding of a particular plaintiff's [constitutional claim], then the District Court is in essence being called upon to review the state court decision. This the District Court may not do.
>
> Moreover, the fact that we may not have jurisdiction to review a final state court judgment because of a petitioner's failure to raise his constitutional claims in state court does not mean that a United States District Court should have jurisdiction over the claims.  *By failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state court decision in any federal court.  This result is eminently defensible on policy grounds.  We have noted the competence of state courts to adjudicate federal constitutional claims.*

<u>Feldman</u>, 460 U.S. at 483 n.16 (emphasis added) (citing <u>Sumner v. Mata</u>, 449 U.S. 539, 549 (1981); <u>Allen v. McCurry</u>, 449 U.S. 90, 105 (1980); <u>Swain v. Pressley</u>, 430 U.S. 372, 383 (1977)).

It is readily apparent from Daniels' requested relief that he is asking the Court to examine the state court judgment against him and find it void *as applied*.  As set out in <u>Feldman</u> and reinforced in <u>Exxon Mobil</u>, lower federal courts lack subject matter jurisdiction to entertain those claims because such claims require the federal court to review the decision of the state court *in a particular case*, not merely the

statute as it is generally applies.  <u>Exxon Mobil</u>, 544 U.S. at ---, 125 S. Ct. at 1523;

<u>Feldman</u>, 460 U.S. at 486-87.

At its core, Daniels' complaint is a request for this Court to declare the state

court judgment void; he simply recasts that request as a § 1983 action.  This he

cannot do.  <u>See</u> <u>Prince</u>, 380 F.3d at 340 ("[I]f the litigant's interest in having the rule

or regulation set aside is inseparable from his interest in upsetting a particular state

court judgment based on that rule, the challenge is no longer independent.").  "The

<u>Rooker-Feldman</u> doctrine bars both straightforward and indirect attempts by a plaintiff

to 'undermine state court decisions.'  Litigants may not pursue federal claims with

allegations that are inextricably intertwined with a state court decision."  <u>Id.</u> (citing

<u>Feldman</u>, 460 U.S. at 487-88).

As a final note, the Court is confident that Daniels is fully aware of the limited

appellate jurisdiction of the federal courts.  In his petition for writ of certiorari to the

United States Supreme Court, Daniels acknowledged that the Iowa Supreme Court's

denial of his petition for writ of certiorari was the final decision of the state's highest

court and that the United States Supreme Court had exclusive jurisdiction over appel-

late review of that decision.

## STATEMENT OF JURISDICTION

The Judgment of the District Court for Jasper County, Iowa was entered
on November 19, 2001.  Appeal to the Iowa Supreme Court was
dismissed on October 22, 2002.  Petition for Writ of Certiorari to the

18

> Iowa Supreme Court was denied on January 8, 2003.  It is from this
> final order of January 8, 2003 that Petitioner brings this Petition for Writ
> of Certiorari.  The jurisdiction of this court is invoked pursuant to 28
> USC Section 1257.

Brief for Appellant at 2, <u>Indian Creek Corp. v. State of Iowa</u>, 2003 WL 22428256
(U.S. Apr. 7, 2003).

The Court finds Daniels' claims are inextricably intertwined with the judgment
of the state court.  Daniels' claim challenging the constitutionality of § 455B.109
cannot be maintained in federal district court because he seeks a review of the
application of that statute in a particular case.  Daniels was given ample opportunity to
raise the necessary constitutional claims in state court.  <u>Rooker-Feldman</u> precludes a
litigant from re-litigating issues in federal district court in the context of a § 1983 claim
for the purpose of having the state court judgment declared invalid.  <u>Prince</u>, 380 F.3d
at 340.[6]

Although the Court finds the <u>Rooker-Feldman</u> doctrine bars Daniels' claims,
the Defendants' several alternative theories for dismissal merit some discussion.

**B.      Claim and Issue Preclusion**

---

[6] Daniels' claim that the penalty assessed is excessive in violation of the Eighth
Amendment is similarly barred.  Although Daniels argues he could not have raised this
claim in the state court proceeding because the penalty was not imposed until the
court issued its order, the penalty was an application of the statute.  Iowa Code §
455B.191(1).  Therefore, a challenge to the penalty imposed is an extension of
Daniels' challenge to the constitutionality of the statute as a whole and does not
constitute a separate claim.

Defendants assert that Daniels' complaint should be dismissed because his claims are barred by the doctrines of claim and issue preclusion.   "The general rule provides that a valid and final judgment on a claim precludes a second action on that claim or any part of it." Amevik v. Univ. of Minn. Bd. of Regents, 642 N.W. 2d 315, 319 (Iowa 2002).

> Claim preclusion is based on the principle that a party may not split or try his claim piecemeal, but must put in issue and try his entire claim or put forth his entire defense in the case on trial.  An adjudication in a former suit between the same parties on the same claim is final as to all matters which could have been presented to the court for determination. A party must litigate all matters growing out of his claim at one time and not in separate actions.

Iowa Coal Mining Co. v. Monroe County, 555 N.W.2d 418, 441 (Iowa 1996) (citing B & B Asphalt Co., Inc. v. T. S. McShane Co. Inc., 242 N.W.2d 279, 286 (Iowa 1976)).

The Full Faith and Credit Act "requires the federal court 'give the same pre-clusive effect to a state-court judgment as another court of that State would give.'" Exxon Mobil, 544 U.S. at ---, 125 S. Ct. at 1527 (quoting Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518, 523 (1986) (citing 28 U.S.C. § 1738)).

In this case, the Court would be required to determine whether Daniels' claims are barred under Iowa law.  Iowa courts will look at the following factors to determine whether claim preclusion applies:  (1) the parties were the same in the first and second actions; (2) the claim in the second suit could have been fully and fairly adjudicated in

the prior case; and (3) there was final judgment on the merits in the first action. Amevik, 642 N.W.2d at 319.

Similarly, collateral estoppel, or issue preclusion, bars relitigation of identical issues actually litigated in a previous action.  Cook v. Electrolux Home Products, Inc., 353 F. Supp. 2d 1002, 1009 (N.D. Iowa 2005) (citing Popp Telcom v. Am. Sharecom, Inc., 210 F.3d 928, 939 (8th Cir. 2000) and Lane v. Peterson, 899 F.2d 737, 741 (8th Cir. 1990)).  "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Montana v. United States, 440 U.S. 147, 153 (1979).

Under the doctrine of collateral estoppel, as with the doctrine of res judicata, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."  Allen, 449 U.S. at 96 (citing 26 U.S.C. § 1738).  Iowa law has long recognized the principle of collateral estoppel.  See Goolsby v. Derby, 189 N.W.2d 909, 915 (Iowa 1971).  Issue preclusion serves the dual purpose of "'protect[ing] litigants from the vexation of relitigating identical issues with identical parties or those persons with a significant connected interest to the prior litigation'" and "'further[ing] the interest of judicial economy and efficiency by preventing unnecessary litigation.'"

Am. Family Mut. Ins. Co. v. Allied Mut. Ins. Co., 562 N.W.2d 159, 163 (Iowa 1997)

(quoting State ex rel. Casas v. Fellmer, 521 N.W.2d 738, 740-41 (Iowa 1994)).

> Issue preclusion applies if the following four requirements are met:
> (1) the issue determined in the prior action is identical to the present issue; (2) the issue was raised and litigated in the prior action; (3) the issue was material and relevant to the disposition in the prior action; and (4) the determination made of the issue in the prior action was necessary and essential to that resulting judgment.

Id. at 163-64.

Daniels argues that preclusion doctrines do not apply in this case because he was not given a fair opportunity to litigate the federal claims in the state court proceeding.  Specifically, Daniels argues he was unable to litigate the following constitutional claims:  (1)  the state's failure to afford him criminal due process as required by the magnitude of the fines assessed; (2) incorrect application of statutes; and (3) activities of Defendants in transfer of Indian Creek Corporation's licenses and permits to a third party subsequent to the state court proceedings in violation of his constitutional rights.  Daniels argues that because the events leading up to each of these claims arose during or as a result of the trial, it would have been impossible for him to raise these claims in state court.

Daniels' argument fails.  The first element of res judicata is met: The parties in the state court proceeding and the present action are the same.  As to the second element, despite Daniels' argument to the contrary, the claims in this suit could have

been fully and fairly adjudicated in the prior proceeding.  If the constitutional issues

regarding the procedure and application of the statute Daniels now questions arose

during the state court proceeding, the proper channel to challenge those applications

was a *timely* appeal to the Iowa Supreme Court.  See Rooker I, 261 U. S. at 17.  In

fact, Daniels did raise those issues in his writ of certiorari to the Iowa Supreme Court.

Unfortunately, Daniels failed to timely file his appeal, divesting the appellate court of

jurisdiction.  Robco Transp., Inc. v. Ritter, 356 N.W.2d 497, 498 (Iowa 1984) ("A

timely appeal is jurisdictional, and cannot be conferred by consent, much less the

silence of the appellee.  It is our duty to refuse, on our own motion, to entertain an

appeal not authorized by rule.").  An untimely appeal does not somehow enlarge his

right to make a federal claim.  See Rooker I, 261 U. S. at 17 ("Federal questions, like

others, should be presented in an orderly way before judgment.").

Third, the state court action resulted in a trial and judgment on the merits.

Daniels could have and in fact was required to raise his constitutional challenges at

that time or lose those claims.  Rooker II, 263 U.S. at 415 ("If the constitutional

questions stated in the bill actually arose in the cause, it was the province and duty of

the state courts to decide them . . . .");  see Amevik, 642 N.W. 2d at 319 ("A party

must litigate all matters growing out of his claim at one time and not in

separate actions.").

As Defendants argue, Daniels now raises the same issues before this Court within the context of a § 1983 claim that were raised, litigated, and material to the state court proceeding.  For example, in his complaint, Daniels argues he was not in violation of the spray irrigation regulation, he was not in violation of improperly closing a storage basin, and he defends that the dead vegetation near the buildings was a result of his use of Roundup weed treatment.  Each of these issues was decided by the state court, and Daniels was found in violation of each one; in the present action, he simply recasts the issues as § 1983 claims against various officials.

"Section 1983 does not override state preclusion law and guarantee petitioner a right to proceed to judgment in state court on her state claims and then turn to federal court for adjudication of her federal claims."  Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 85 (1984).  The doctrine applies even when the party currently claiming a violation of federal right was the defendant in the state court proceeding.  Allen, 449 U.S at 104 ("There is . . . no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all.").

Daniels failed to raise his constitutional challenges in the state court proceeding but raised them in an untimely appeal which was barred by the Iowa Supreme Court.  Accordingly, the determination of the Iowa District Court for Jasper County became

the final judgment in the case. This Court must give the same effect to the state district court's determination it was given by the Iowa Supreme Court.

As previously stated, § 1738 provides that state court judgments be given the same full faith and credit in every court within the United States to avoid vexatious litigation and separate suits by the same plaintiff in different forums for damages that were sustained simultaneously. Migra, 465 U.S. at 86 (citing 28 U.S.C. § 1738). Daniels did not initially raise any constitutional issues in the state court suit, but in his petitions for writ of certiorari to the Iowa Supreme Court and the United States Supreme Court, he alleged his constitutional rights had been violated under the Fifth, Eighth, and Fourteenth Amendments. Even if Daniels had not raised those constitutional issues in his petitions for writ, Daniels' attempt to raise the current issues couched as § 1983 claims would be barred from relitigation under the doctrines of res judicata and collateral estoppel.

## C.    Sovereign Immunity

Defendants assert that Daniels' claims against the state and the individual defendants in their official capacities are barred by sovereign immunity. Daniels argues "Section 5 of the Fourteenth Amendment is a valid basis for abrogating Eleventh Amendment immunity because that Amendment (§ 5) was intended to 'fundamentally alter' the balance of state and federal power struck by the

25

Constitution." Humenansky v. Regents of Univ. of Minn., 152 F.3d 822, 826 (8th Cir. 1998).

"For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996). Claims brought against agents of the state acting in their official capacity are also protected by the doctrine of sovereign immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989). Section 1983 defines particular "persons" liable for violations of constitutional rights, however, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Id. at 71. "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Id. (citations omitted) (citing Brandon v. Holt, 469 U.S. 464, 471 (1985)).

Daniels quotes black letter law from Humenansky v. Regents of University of Minnesota and asserts § 5 of the Fourteenth Amendment is a valid basis for abrogating a States' sovereign immunity. Humenansky, 152 F.3d at 826. Daniels does not explain how Humenansky applies to the present case, nor does the Court find a connection.

At issue in <u>Humenansky</u> was a claim brought against the state of Minnesota[7] under the Age Discrimination in Employment Act ("ADEA").  <u>Humenansky</u>, 152 F.3d 822, 826 (8th Cir. 1998).  Consistent with the Supreme Court's holding in <u>Seminole Tribe of Florida v. Florida</u>, the Eighth Circuit found that when Congress chooses to abrogate Eleventh Amendment immunity, it must express its intent in "'unmistakable language in the statute itself.'"  <u>Id.</u> (quoting <u>Seminole Tribe</u>, 517 U.S. at 55).  The <u>Humenansky</u> court went on to find that the ADEA *exceeded* Congress' authority under § 5 of the Fourteenth Amendment to abrogated Eleventh Amendment immunity.  <u>Id.</u> at 828.  The Supreme Court took the same position in <u>Kimel v. Florida Bd. of Regents</u>, 528 U.S. 62, 91 (2000), holding "[t]he ADEA's purported abrogation of the States' sovereign immunity is accordingly invalid."

In the present case, the question is whether 28 U.S.C. § 1983 abrogates the States' sovereign immunity.  Unfortunately for Daniels' argument, the Supreme Court has already determined that § 1983 exceeds Congress' authority to abrogate sovereign immunity under § 5 of the Fourteenth Amendment.  <u>Will</u>, 491 U.S. 58, 66 (1989).

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its

---

[7] The lawsuit named the University of Minnesota as defendant, but as an instrumentality of the state, the University was entitled to invoke Eleventh Amendment immunity.  <u>Humenansky</u>, 152 F.3d at 824.

immunity, or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.  That Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance in that respect was made clear in our decision in <u>Quern</u>.  Given that a principal purpose behind the enactment of § 1983 was to provide a federal forum for civil rights claims, and that Congress did not provide such a federal forum for civil rights claims against States, we cannot accept petitioner's argument that Congress intended nevertheless to create a cause of action against States to be brought in state courts, which are precisely the courts Congress sought to allow civil rights claimants to avoid through § 1983.

<u>Id.</u> at 66 (citations omitted).

Accordingly, Daniels' claims against the State of Iowa, and individual Defendants Vont Asell, Johnson, Wilson, and Nelson, in their official capacities, are claims against the State itself and therefore barred by sovereign immunity.

**D.     Absolute Immunity**

Defendants also assert that the claims against the DNR officials in their individual capacities should be dismissed because they are all entitled to absolute immunity since Daniels is suing them for acts committed in their prosecutorial capacities.  Daniels argues Defendants' absolute immunity does not encompass investigative functions.

"Absolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation."  <u>Id.</u> at 483.  A prosecutor is immune from suit under § 1983 for initiating a prosecution and in presenting the State's case.

Imbler v. Pachtman, 424 U.S. 409, 431 (1976).  Likewise, agency officials

performing certain functions analogous to that of a prosecutor have absolute immunity

from suit pursuant to those acts.  Butz v. Economou, 438 U.S. 478, 515 (1978);

Dunham v. Wadley, 195 F.3d 1007, 1010 (8th Cir. 1999) ("Persons who perform

quasi-judicial functions are entitled to absolute immunity.").  A decision to initiate an

administrative proceeding is very much like a prosecutor's decision to move forward

with a criminal prosecution.  Butz, 438 U.S. at 515.  "The discretion which executive

officials exercise with respect to the initiation of administrative proceedings might be

distorted if their immunity from damages arising from that decision was less than

complete."  Id.  "Agency officials must make the decision to move forward with an

administrative proceeding free from intimidation or harassment."  Id. at 516.

Therefore, those officials who are responsible for the decision to initiate or continue

proceedings pursuant to an agency decision are entitled to absolute immunity from suit

for their parts in that decision.  Id.

Daniels relies on Burns v. Reed, 500 U.S. 478 (1991), where the Supreme

Court addressed the issue of whether a state prosecuting attorney is absolutely

immune from liability for damages under § 1983.  In the Burns case, the state

prosecutor gave legal advice to the police and participated in a probable cause hearing.

Burns, 500 U.S. at 491.  The Court found the prosecutor's participation in the

probable cause hearing was a protected function because it was "conduct closely

associated with the judicial process."  <u>Id.</u> at 492 ("[P]retrial court appearances by the

prosecutor in support of taking criminal action against a suspect present a substantial

likelihood of vexatious litigation that might have an untoward effect on the

independence of the prosecutor.  Therefore, absolute immunity for this function

serves the policy of protecting the judicial process . . . .").  But, the Court went on to

reason that acts as "an administrator or investigative officer" which were not "so

intimately associated with the judicial phase" did not warrant absolute immunity.  <u>Id.</u>

at 493.

> We do not believe, however, that advising the police in the investigative
> phase of a criminal case is so 'intimately associated with the judicial
> phase of the criminal process,' that it qualifies for absolute immunity.
> Absent a tradition of immunity comparable to the common-law immunity
> from malicious prosecution, which formed the basis for the decision in
> <u>Imbler</u>, we have not been inclined to extend absolute immunity from
> liability under § 1983.

<u>Id.</u> (citation omitted) (quoting <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430 (1976)).

By analogy, Daniels asserts the officials' actions in the present case were

investigative in nature and are not entitled to absolute immunity.  This analogy is over-

reaching.  The <u>Burns</u> case does not presume that performing investigative duties

necessarily precludes an officer from enjoying absolute immunity; rather, in

determining whether a defendant is entitled to absolute immunity, the court will focus

on whether the prosecutor's actions are closely related to the judicial process.  <u>Id.</u> at

492.  The court will take into consideration that duties of a prosecutor involve actions

preliminary to the initiation of a prosecution.  Id. at 490-91 ("[A] prosecutor is

absolutely immune for initiating a prosecution and for presenting the State's case.

The Court also observed that 'the duties of the prosecutor in his role as advocate for

the State involve actions preliminary to the initiation of a prosecution.'") (citation

omitted) (quoting Imbler, 424 U.S. at 431).

During times relevant to Daniels' complaint, four of the individually named

Defendants, Vont, Asell, Johnson, and Wilson were Directors of the Iowa DNR.

Defendant Nelson was an Environmental Specialist for the Iowa DNR who inspected

the facility and submitted her report to the Iowa DNR.  Under Iowa law, the Iowa

DNR is the agency responsible for prevention, abatement, or control of water

pollution.  Iowa Code § 455B.172(1).  The Iowa DNR may evaluate any animal

feeding operation to determine whether manure from the operation is causing, or may

reasonably be expected to cause, pollution of a water of the state; and if the DNR

determines that this condition exists, the operation shall, upon notification from the

DNR, institute necessary remedial action to eliminate the condition.  567 IAC 65.5(1-

2).  The Iowa EPC is authorized to adopt, modify, or repeal rules relating to the

construction and operation of animal feeding operations.  Iowa Code § 455B.173(13).

The Attorney General, at the request of the Iowa DNR, with approval of the Iowa

EPC, is authorized to initiate any legal proceedings, including an action for an

injunction or temporary injunction, necessary to enforce the penalty provisions of

Iowa Code § 455B.  Iowa Code § 455B.191(4).  The penalty imposed for each day of violation is $5000.00.  Iowa Code § 455B.191(1).

Defendants rely on Dunham v. Wadley, 195 F.3d at 1011, and argue they are entitled to absolutely immunity in the present case.  In Dunham, the defendants were members of the veterinary medical examining board ("the Board").  Id. at 1008.  The Board received complaints that Dunham was practicing veterinary medicine without a license in violation of state law.  Id. at 1008-09.  The Board concluded that Dunham violated the state statute and sent cease and desist letters to Dunham and her two employers.  Id. at 1009.  In a subsequent § 1983 action, Dunham sought damages from the Board members in their individual capacities; the members moved for summary judgment, arguing they were entitled to absolute immunity.  Id.  The court agreed, finding the members evaluated evidence, made factual determinations, determined sanctions, and wrote recommendations which were functionally comparable to duties performed by courts and therefore entitled to sovereign immunity.  Id. at 1011.

The Defendants' conduct in the present case is slightly different than that of the board of examiners in Dunham.  Here, the DNR officials presented evidence to the EPC and recommended bringing charges.  The EPC evaluated the evidence and voted to refer the matter to the Attorney General.  It was the EPC, not the DNR, that performed a function analogous to the board of examiners in Dunham.  Without more

32

information from the Defendants, it appears that the Defendants' functions were more of "administrator[s] or investigative officer[s]" rather than "conduct closely associated with the judicial process", Burns, 500 U.S. at 491; and, therefore, it appears on the record before the Court they have not met their burden of showing they are entitled to absolute immunity.  Id. at 486-87.

Daniels charges the named officials for their role in initiating actions against him under the Iowa statute.  Two years before action was recommended, DNR officials informed Daniels of the violations, made written recommendations, determined sanctions, developed remedial plans, and began working with him to bring the operation into compliance.  Ultimately, the DNR submitted the evidence to the EPC and recommended bringing charges against Daniels and the Indian Creek Operation. The EPC adopted the recommendations and voted to submit the matter to the Attorney General for purposes of initiating judicial proceedings against Daniels and the Indian Creek Operation.

Defendants argue they were operating within their statutory authority when they made their recommendations to the Iowa EPC.  However, it is the burden of the actor seeking the absolute immunity to show such immunity is justified in the function performed.

> "[T]he official seeking absolute immunity bears the burden of showing
> that such immunity is justified for the function in question.  The
> presumption is that qualified rather than absolute immunity is sufficient

> to protect government officials in the exercise of their duties.  We have
> been 'quite sparing' in our recognition of absolute immunity, and have
> refused to extend it any 'further than its justification would warrant.'

Burns, 500 U.S. at 486-87 (citations omitted) (quoting Harlow v. Fitzgerald, 457 U.S.

800, 811 (1982)).

On the record before the Court, Defendants have not made the necessary

showing that absolute immunity is justified for the function in question.

**E.     Qualified Immunity**

Defendants' final argument is that Daniels' complaint should be dismissed

because all individually named defendants are entitled to qualified immunity.  Defen-

dants argue that Daniels' complaint fails to satisfy the question of whether a consti-

tutional right was violated under the test set forth in Saucier v. Katz, 533 U.S. 194,

194 (2001).  Daniels rebuts this argument, asserting Defendants violated his

constitutional rights by pursuing him when they were aware that their actions were for

purposes of exacting punishment rather than remedial measures, and therefore they

are not entitled to qualified immunity.

Generally, government officials performing discretionary functions have quali-

fied immunity, shielding them from civil liability.  Anderson v. Creighton, 483 U.S.

635, 638 (1987).  In determining whether or not a government official is protected by

qualified immunity, the courts will look at a two-part analysis.  Saucier v. Katz, 533

U.S. 194, 200 (2001).  The initial inquiry asks, when "[t]aken in the light most

34

favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." Id. at 201.  If no constitutional right was violated, there is no need for further inquiry concerning qualified immunity.  Id.  But if a constitutional right has been violated, the next part of the analysis is to ask whether the right was clearly established.  Id.  For a right to be clearly established, the "contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson, 483 U.S. at 640.

Daniels asserts that the statute Defendants were operating under is unconstitutional, they acted beyond the scope of that statutory authority, and their prosecution amounts to an abuse of process and malicious prosecution.  Daniels argues that Defendants have failed to prove they are entitled to qualified immunity and that further discovery will show that the Defendants arbitrarily and discriminatorily enforced the statute and that action was brought against him for the purpose of exacting punishment rather than for remedial purposes.

Daniels fails to substantiate or even allege that the Defendants violated a clearly established constitutional right; rather, he asks the Court to defer ruling on the issue of qualified immunity to allow further discovery which will demonstrate the true nature of the Defendants' conduct.  He further suggests that a Rule 12(b) motion is not the appropriate time to assert the affirmative defense of qualified immunity, and the motion should be denied on that ground as well.  Both assertions are incorrect.

The violation of a clearly established right must be established at the time the violation occurred; otherwise, Defendants are entitled to qualified immunity.  Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996) ("'[Q]ualified immunity is an affirmative defense,' and 'it will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint.'") (quoting Weaver v. Clarke, 45 F.3d 1253, 1256 (8th Cir. 1995)).

Defendants were functioning in their official capacities as official of the Iowa DNR, an agency of the State of Iowa.  Daniels provides no basis upon which the Court can conclude that the officials, acting pursuant to a valid statute, committed any constitutional violation.  Furthermore, even if Daniels had established that the Defendants violated one or more of his constitutional rights, the right violated must have been a clearly established right.  Saucier, 533 U.S. at 202.  If a law does not put an official on notice that his conduct would be clearly unlawful, summary judgment is appropriate based on qualified immunity.  Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  By recommending that action be taken in state court, Defendants were acting pursuant to Iowa Code Section 455B.191; it would not have been sufficiently clear to a reasonable official that acting pursuant to a regulation would be clearly unlawful.  Thus, the Defendants' actions fail the second part of the Saucier test.  Even when the evidence is taken in the light most favorable to Daniels, it appears that Defendants are entitled to qualified immunity.

36

### III.  CONCLUSION

Daniels brought this action in federal court seeking relief under § 1983, alleging

the Defendants violated constitutional rights by enforcing an unconstitutional statute.

As relief, the Court is asked to find the statute unconstitutional, void the state court

judgment, enjoin the state from future suits against him under the statute, and

award damages.

For the reasons set forth above, the Court finds this case must be dismissed

under the <u>Rooker-Feldman</u> doctrine.  At its core, this case is an attempt to have this

Court void the state court judgment.  This is precisely the type of case the <u>Rooker-</u>

<u>Feldman</u> doctrine precludes.  <u>Exxon Mobil</u>, 544 U.S. at - - -, 125 S. Ct. at 1523

(reiterating that review of the application of a state statute *in a particular case*, not

merely the statute as it is generally applies, would require the federal district court to

review a state court decision, jurisdiction over which the Supreme Court only

has authority).

Beyond that initial jurisdictional determination, and as detailed above, Plaintiffs'

claims suffer other jurisdictional and procedural maladies.  The claims against the

State of Iowa and the individual Defendants in their official capacities are barred by

sovereign immunity, <u>Will</u>, 491 U.S. at 66 (finding 28 U.S.C. § 1983 exceeds

Congress' authority to abrogate sovereign immunity under § 5 of the Fourteenth

Amendment).  The claims and issues against the Defendants have been previously

litigated in state court and are therefore barred by res judicata and collateral estoppel. Amevik, 642 N.W.2d at 319; Migra, 465 U.S. at 86 (citing 28 U.S.C. § 1738) (reasoning that, to avoid vexatious litigation and separate suits by the same plaintiff in different forums for damages that were sustained simultaneously, courts must give the state court judgement the same full faith and credit the state would give the decision). And finally, the claims against the Defendants in their individual capacities fail to allege that a constitutional right has been violated, and even if they had been able to so demonstrate, they have not alleged nor shown that the Defendants acted unreasonably.  Accordingly, the Defendants would be entitled to qualified immunity on those claims.  Saucier, 533 U.S. at 202.

For the foregoing reasons, Defendants' Motion to Dismiss [Clerk's No. 3] must be **granted**.

**IT IS SO ORDERED**.

Dated this 23rd day of May, 2005.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT